823 A.2d 809 (2003)
BANCO POPULAR NORTH AMERICA, Plaintiff-Appellant,
v.
Suresh GANDI a/k/a Suresh Gandhi, Madhu S. Gandi a/k/a Madhu S. Gandhi, and Richard P. Freedman, Esq., Defendants-Respondents,
and
Angelini, Viniar & Freedman, a New Jersey general partnership; Michael A. Angelini, Esq., a partner; and Carl B. Viniar, Esq., a partner, Defendants.
Superior Court of New Jersey, Appellate Division.
Submitted February 26, 2003.
Decided April 29, 2003.
*810 Orloff, Lowenbach, Stifelman & Siegel, attorneys for appellant (Samuel Feldman, Roseland, on the brief).
Riker, Danzig, Scherer, Hyland & Perretti, attorneys for respondent Richard P. Freedman (Glenn A. Clark, of counsel; Lance J. Kalik, Morristown, and Jennifer A. Serafyn, on the brief).
No brief was submitted on behalf of respondents Suresh Gandi and Madhu S. Gandi.
Before Judges WEFING, LISA and FUENTES.
The opinion of the court was delivered by WEFING, J.A.D.
Defendant, Suresh Gandi ("Suresh"), operated several fast-food restaurants. He is married to defendant, Madhu Gandi ("Madhu"). Defendant, Richard P. Freedman, Esq. ("Freedman"), is an attorney who represented Suresh in connection with several matters. Suresh held franchises from Arby's and Burger King and ran at least three restaurants, each through a separate corporation. Echelon Fast Food Inc. ("Echelon") ran the Arby's while Priya Fast Foods, Inc. ("Priya") and Priya Fast Foods II, Inc. ("Priya II") each operated a Burger King in New York City.
Suresh had assets in addition to these businesses. He and Madhu jointly owned two homes, one in Voorhees, in which they lived, and a two-family house in Mount Laurel, which they rented out. They also owned securities in the form of a mutual fund.
At some point (it is not immediately clear from the record precisely when), Suresh was engaged in a dispute with Arby's. Plaintiff, Banco Popular North America ("Banco Popular"), alleges that Suresh consulted Freedman in connection with that dispute and Freedman advised him to transfer the two houses and the mutual fund into Madhu's name.
Banco Popular provided loans to Priya and Priya II in connection with the two Burger King restaurants and Suresh personally *811 guaranteed the notes. The restaurants were not successful and Suresh defaulted on these loans. Banco Popular obtained a judgment in New York against Suresh for $1,251,574.58 and had the judgment docketed in New Jersey.
It then began this action, which has had a tortured procedural history, to collect on that judgment. The original defendants were Suresh and Madhu, to whom Suresh had made the transfers. Plaintiff alleged in its complaint that the transfers were fraudulent under the Uniform Fraudulent Transfer Act, ("UFTA"), N.J.S.A. 25:2-27. After Suresh was deposed and testified that Freedman had advised him to make the transfers, Banco Popular joined Freedman as a defendant.
Madhu filed an answer in which she denied that the transfers were fraudulent. She alleged that the Mount Laurel property had been sold in an arm's length transaction and the proceeds used to satisfy the mortgage on that property, which was held by Commerce Bank. She also alleged that a certificate of deposit, which held the balance of the proceeds of sale of the Mt. Laurel house and the liquidation of the mutual fund, had been used to satisfy a debt to Commerce Bank that pre-dated Suresh's debt to Banco Popular.
Freedman was first named as a defendant in what plaintiff referred to as its Second Amended Complaint. The fourth and fifth counts of that complaint were directed to Freedman. The fourth count alleged that Freedman owed a duty to Banco Popular which he breached by negligently advising Suresh to transfer assets, making him unable to fulfill his financial obligations to Banco Popular. The fifth count alleged that Freedman conspired with Suresh and Madhu to defraud Suresh's creditors.
Freedman did not file an answer to the Second Amended Complaint. Rather, he filed a motion under R. 4:6-2 to dismiss for failure to state a claim. During oral argument on the motion, Banco Popular pointed to the Rules of Professional Conduct ("RPCs"), specifically RPC 1.2(d), as the source of the duty it alleged Freedman owed to it as one of Suresh's creditors. The trial court granted Freedman's motion and entered an order dismissing both counts without prejudice.[1]
Thereafter, Banco Popular filed both what it termed an "Amendment to the Second Amended Complaint" and a motion for leave to file a third amended complaint. After this motion was granted, it filed the Third Amended Complaint on January 31, 2002, of which counts four through seven were directed to Freedman. Freedman again filed a motion to dismiss for failure to state a claim, which the trial court granted by order entered on March 18, 2002.
Several weeks later, the trial court entered another order, granting Banco Popular summary judgment against Madhu and a default judgment against Suresh. That order directed Madhu to convey to Suresh and herself a one-half interest in the Voorhees property and to pay to Banco Popular half of the imputed rental value of the Voorhees property, commencing from entry *812 of the judgment. It gave Banco Popular a lien on her interest in the Voorhees property and entered a judgment against her in the sum of $83,507.51.[2] Banco Popular now appeals from the dismissal of its claims against Freedman. After a careful review of the record in light of the contentions advanced on appeal, we affirm in part and reverse in part.

I.
In its brief on appeal, Banco Popular makes the following arguments: that its Third Amended Complaint stated claims of common law fraud and creditor fraud, conspiracy and negligence against Freedman, as well as against his firm and his partners and that both its Second and Third Amended Complaints stated claims of negligence. We consider it necessary to address only the claims pleaded in the Third Amended Complaint, which is far more detailed and specific than the conclusory allegations contained in the Second Amended Complaint. If the claims asserted in the Third Amended Complaint are legally insufficient, it must logically follow that those attempted to be pled in the Second Amended Complaint are as well.
Before undertaking a detailed analysis of the particular claims involved here, it is appropriate to note the procedural posture in which the matter was presented to the trial court, a motion to dismiss for failure to state a claim upon which relief can be granted, R. 4:6-2(e). The standard governing such a motion is well-known. It was clearly and succinctly stated by the Supreme Court in Printing Mart v. Sharp Electronics, 116 N.J. 739, 563 A.2d 31 (1989).
[T]he test for determining the adequacy of a pleading [is] whether a cause of action is "suggested" by the facts .... our inquiry is limited to examining the legal sufficiency of the facts alleged on the face of the complaint .... a reviewing court "searches the complaint in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary." At this preliminary stage of the litigation the Court is not concerned with the ability of plaintiffs to prove the allegation contained in the complaint. For purposes of analysis plaintiffs are entitled to every reasonable inference of fact. The examination of a complaint's allegations of fact required by the aforestated principles should be one that is at once painstaking and undertaken with a generous and hospitable approach.
[Printing Mart, supra, 116 N.J. at 746, 563 A.2d 31 (citations omitted).]
Freedman within his responding brief notes that he denies plaintiff's allegations that he counseled and assisted Gandhi to defeat the rights of his creditors. We have no occasion to pass upon the truth or falsity of plaintiff's allegations. By repeating them within the course of this opinion, we should not be understood as accepting them as fact, other than for purposes of the necessary analysis of R. 4:6-2(e).

II.
In order to understand our analysis of the question whether Banco Popular properly asserted a claim against Freedman, we set forth the details of what it asserted in its Third Amended Complaint. It alleged that Suresh retained Freedman "in about 1998" in connection with a claim against Suresh relating to his Arby's franchise and that Freedman advised Suresh to transfer all of his assets to place them *813 beyond the reach of Arby's. It further alleged that Freedman assisted in completing the transfers by preparing deeds for the Voorhees and the Mount Laurel properties, placing them in Madhu's name alone. It alleged that shortly after the transfers, Freedman issued an Opinion Letter to Banco Popular, dated July 21, 1998, in connection with a loan of $750,000 to Priya II. Within that Opinion Letter, Freedman represented to Banco Popular that he was unaware of any matter that was contrary to the representations and warranties of the corporation and Suresh contained in the loan documents. The loan documents included Suresh's personal guarantee of the indebtedness. Paragraph 2(j) of the Representation, Warranty and Covenant Section of that Guarantee executed by Suresh included the following provision:
During the term of the loan, provided Guarantor shall maintain a net worth of not less than $950,000, Guarantor shall have the right to transfer, sell or assign any real or personal property owned by him, without the requirement of obtaining the Lender's consent.
Banco Popular asserted that this language constituted a representation that Suresh had a net worth of at least $950,000, that it was false in light of the earlier transfers and that Freedman knew it to be false. The complaint also alleged that in June 1998 Suresh had signed another guaranty under which he had covenanted that he would not transfer all or substantially all of his assets without the bank's written consent.
The bank alleged within the fourth count of the Third Amended Complaint that Freeman's conduct constituted unethical conduct, creditor fraud and common law fraud. The sixth count, after incorporating the prior allegations, maintained that Freedman was involved in negotiating the terms of the loan, knew that the bank would rely on his Opinion Letter and owed a duty to the bank as a consequence. It asserted that by issuing a false and misleading Opinion Letter, Freedman breached the duty of care he owed the bank.

III.
We turn first to the claim of common law fraud. To prevail on a claim of fraud, a plaintiff must allege and prove five elements: a material misrepresentation of a presently existing or past fact; knowledge or belief that the representation was false; the intention that the other party rely on the representation; reasonable reliance by the other party; and resultant damages. Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610, 691 A.2d 350 (1997). Banco Popular contends that Freedman's Opinion Letter contains a misrepresentation because he knew that Suresh did not, as a result of the transfers to his wife, have a net worth of $950,000.
We agree with the trial court that the language of Suresh's guarantee cannot fairly be read, even under the indulgent standards of Printing Mart, supra, to contain a representation by Suresh that he had a net worth of at least $950,000 at the time the loan transaction closed.[3] Nothing within that language purports to be a representation as to net worth; rather, it merely places the threshold at which Suresh would have to seek approval of the bank if he wished to make any transfer of assets. The bank may have understood that Suresh had a net worth of at least $950,000. It did not, however, place within *814 the loan documents a representation to that effect and a court cannot insert one later on. Karl's Sales & Svce. v. Gimbel Bros., 249 N.J.Super. 487, 592 A.2d 647 (App.Div.), certif. denied, 127 N.J. 548, 606 A.2d 362 (1991) (noting that a court cannot make a better contract for the parties than they made for themselves).
In support of its claim of common law fraud, the bank points to an additional guarantee executed by Suresh a month prior to Freedman's Opinion Letter. That guarantee contained the following statement: "Guarantor [Suresh] has not and will not, without the prior written consent of Lender sell, lease, assign, encumber, hypothecate, transfer or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein". That, plaintiff asserts, was false and conflicted with Freedman's Opinion Letter. That guarantee, however, was not part of the loan to Priya II, the transaction in which Freedman issued his Opinion Letter. There is nothing in the record presented to us which would support any inference either that Freedman was involved in that earlier guarantee or that it was in some manner incorporated into the July loan. We are satisfied the trial court correctly dismissed the claims of common law fraud.

IV.
We turn now to what the bank denominates creditor fraud. Relying upon our opinions in Jugan v. Friedman, 275 N.J.Super. 556, 646 A.2d 1112 (App.Div. 1994), certif. den. 138 N.J. 271, 649 A.2d 1291 (1994), and Karo Marketing Corp. v. Playdrome America, 331 N.J.Super. 430, 752 A.2d 341 (App.Div.), certif. denied, 165 N.J. 603, 762 A.2d 217 (2000), it asserts that New Jersey recognizes a separate tort of creditor fraud.
The plaintiff in Jugan had sued defendant Friedman for medical malpractice and recovered a judgment for compensatory damages of $10,000 and punitive damages of $150,000. 275 N.J.Super. at 559, 646 A.2d 1112. Dr. Friedman had an extensive prior history of drug abuse and criminal charges relating to his addiction. His malpractice carrier canceled his coverage two days after plaintiff's complaint was filed and paid the compensatory portion of the judgment but not the punitive portion. Id. at 560, 646 A.2d 1112. Jugan began this action to collect the punitive award. Friedman had no assets in his own name, however, and plaintiff joined Friedman's wife and sons, into whose names everything had been placed. Ibid. We agreed with the trial court that plaintiff Jugan was entitled to set aside those transfers as fraudulent. Further, we recognized that Friedman's efforts to interfere with Jugan's attempt to collect on his judgment debt constituted a separate, cognizable tort. Id. at 571, 646 A.2d 1112.
In Karo Marketing, on the other hand, Karo obtained a judgment against two entities, Playdrome and Playdrex, for marketing services it had performed. 331 N.J.Super. at 435, 752 A.2d 341. It was unable to collect upon that judgment, however. Ibid. Playdrome was defunct before the suit began and Playdrex, during the course of the suit, lost its sole source of income, certain management contracts. Ibid. Karo then began suit to collect on the prior judgment, alleging that defendants had, in order to thwart its ability to collect, created a new corporate entity to hold those management contracts, thus diverting Playdrex's income stream. Id. at 436-37, 752 A.2d 341. Karo included as defendants not only the business entities which made the switch but the individual investors in those entities and the attorney who was alleged to have advised that such a switch was permissible. Id. at 437, 752 A.2d 341. We held that plaintiff had stated *815 a cause of action for creditor fraud against all defendants. Id. at 445, 752 A.2d 341. We did not separately discuss the claim asserted against the attorney, who also held the post of registered agent.
We agree with Banco Popular that in neither Jugan nor Karo was there a "misrepresentation" as that term is commonly understood in the context of fraud but we had no hesitancy in permitting plaintiffs' claims to proceed in each case. Indeed, we said in Karo, "[i]t is not necessary for plaintiff to show a classic case of legal fraud in order to have a viable cause of action when it is otherwise demonstrated that actions have been taken for the purpose of defrauding a creditor." 331 N.J.Super. at 441, 752 A.2d 341. Further, it is not material that the challenged transfers were allegedly completed with an eye on Arby's, not Banco Popular. Jugan, supra, 275 N.J.Super. at 571, 646 A.2d 1112; N.J.S.A. 25:2-25. Other jurisdictions have recognized that an attorney can be held liable in connection with transfers completed in an effort to prevent execution upon a judgment. See Stochastic Decisions, Inc. v. DiDomenico, 995 F.2d 1158 (2d Cir.), cert. denied, 510 U.S. 945, 114 S.Ct. 385, 126 L. Ed.2d 334 (1993).
We stress again that we are writing upon a limited record. The nature and extent of Freedman's activities remain to be developed and will, of course, determine the ultimate question of liability. Scholars have addressed the complex questions such activities may generate.
The lawyer may not become an active participant in the client's unlawful activity, and does not have immunity if she becomes an aider and abettor of unlawful conduct. The difficulty arises in deciding whether providing accurate, truthful information about the lawthe core function of lawyeringcan also be considered active assistance in violation of the law in situations in which the lawyer knows the information may well lead to or facilitate the client's unlawful conduct. The answers or guides to that inquiry are disturbingly unclear.
[Stephen L. Pepper, Counseling at the Limits of the Law: An Exercise in the Jurisprudence and Ethics of Lawyering, 104 Yale L.J. 1545 (1995).]
The Restatement also notes the difficult nature of the question.
In general, a lawyer is not liable for a client's tort unless the lawyer assisted the client through conduct itself tortious or gave substantial assistance to the client knowing the client's conduct to be tortious. See Restatement Second, Torts § 876 (liability of persons acting in concert). Proper advice to a client does not constitute assistance leading to liability. Whether a more onerous standard applies to a lawyer who assists a client's conduct depends on applicable law, which in general requires negligent or intentional misconduct for civil liability to attach to a principal and often requires a higher level of awareness for a lawyer than for a principal.
[Restatement (Third) of the Law Governing Lawyers § 56 comment c (2000).]
We are satisfied that when viewed through the prism of Printing Mart, plaintiff's complaint contained a fundament of a claim for creditor fraud and the trial court erred in dismissing that aspect of plaintiff's complaint.

V.
We turn now to plaintiff's claim of negligence set forth in the sixth count of its third amended complaint. According to that count, Freedman was negligent in issuing the Opinion Letter of July 21, 1998, because, according to the complaint, it was misleading. The basis for this allegation, *816 however, rests entirely on the bank's interpretation of Suresh's accompanying guarantee. We noted that the bank reads the guarantee to contain a representation that Suresh had a net worth of at least $950,000. We rejected that interpretation earlier in connection with our discussion of the bank's claim of fraud. We reject it here, as well, for the same reasons. The second aspect of the bank's negligence claim rests upon the assertion that the Opinion Letter conflicts with the guarantee Suresh issued to the bank approximately one month prior to this loan transaction. Again, for the reasons we stated earlier, this is an insufficient basis upon which to assert a claim against Freedman.
Plaintiff points to our opinion in Davin L.L.C. v. Daham, 329 N.J.Super. 54, 76, 746 A.2d 1034 (App.Div.2000), in which we referred to an attorney's duty of candor and honesty. We are satisfied that it reads too much into our language. We are not at all persuaded by plaintiff's contention that, under Davin, Freedman should have specified in his Opinion Letter that he was not opining on Suresh's financial condition. Nothing within the letter purports to address Suresh's financial soundness. We cannot help but note that it would appear somewhat unusual for a commercial lending institution to look to the debtor's attorney for an assurance of the debtor's creditworthy status. The trial court correctly dismissed the negligence claim pled against Freedman.

VI.
The remaining counts are the fifth, which alleges civil conspiracy, and the seventh, which asserts a claim against defendant Freedman's firm and partners. Some commentators have asserted that conspiracy is not an independent tort in itself but rather simply a view that "each participant should be liable for the tortious course of conduct." Dobbs, The Law of Torts, § 340 (2001). Civil conspiracy was discussed in Jones v. City of Chicago, 856 F.2d 985, 992 (7th Cir.1988), in which the court said, "[i]t is enough [for liability] if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them." See also J. Randolph Evans and Ida Patterson Dorvee, Attorney Liability for Assisting Clients with Wrongful Conduct: Established and Emerging Bases of Liability, 45 So. Car. L.Rev. 803 (1994). Because we have concluded that plaintiff asserted a claim of creditor fraud, we also reinstate the fifth count of the complaint. We understand the seventh count to represent no more than a claim in accordance with the general principles governing the liability of one partner for the acts of another. We reinstate the seventh count for the same reason.
We conclude by restating that defendant Freedman has, throughout his brief to us, stoutly denied the allegations made by plaintiff. We are in no position to determine whether plaintiff can establish its claims by competent, credible evidence. We have, however, concluded that, with the exception of the common law fraud and negligence claims, it must be given the opportunity to attempt to do so.
Reversed and remanded for further proceedings in accordance with this opinion.
NOTES
[1] The order that was entered by the trial court only permitted Banco Popular to file an amended fifth count. The form of order was submitted by Freedman's counsel and, based upon portions of the oral argument, originally provided that the fourth count, alleging negligence, was dismissed with prejudice while the fifth count, alleging conspiracy and fraud, was dismissed without prejudice. Prior to executing the order, the trial court modified the dismissal of the fourth count to be without prejudice but did not similarly modify the provision dealing with the filing of an amended complaint. We, thus, infer that the permission to file an amended complaint was inadvertently limited to the fifth count.
[2] The record does not disclose how that sum was calculated.
[3] Because the matter was presented in a motion to dismiss, the record does not disclose whether plaintiff bank made any efforts, prior to closing on this loan, to confirm what assets, if any, were in Suresh's name.