**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-2088-17T3
      A-2149-17T3

ADAM BAK and AVA
POLANSKY BAK,

  Plaintiffs-Appellants,

v.

ROBERT and JANET MCEWAN,
BOB MCEWAN CONSTRUCTION
CORP., TAMKO BUILDING
PRODUCTS, TRI-STATE
INSPECTION SERVICES, LLC,
JOE MAGGIO CONCRETE &
MASONRY, DENNIS GRANT
CONSTRUCTION CO., A & A
EXTERIORS, INC., GIAMIKE,
INC.,

  Defendants-Respondents,

and

DUNN & DUNN, INC., and
PELLA WINDOWS,

  Defendants.

_____

CUMBERLAND MUTUAL
INSURANCE COMPANY, INC.,

 Plaintiff,

v.

ROBERT and JANET MCEWAN,
BOB MCEWAN CONSTRUCTION
CORP., TAMKO BUILDING
PRODUCTS, TRI-STATE
INSPECTION SERVICES, LLC,
DUNN & DUNN, INC.,
JOE MAGGIO CONCRETE &
MASONRY, DENNIS GRANT
CONSTRUCTION CO., A & A
EXTERIORS, INC., GIAMIKE,
INC., and PELLA WINDOWS,

 Defendants.

---

ADAM BAK and AVA POLANSKY
BAK,

 Plaintiffs,

v.

ROBERT and JANET MCEWAN,
TAMKO BUILDING
PRODUCTS, TRI-STATE
INSPECTION SERVICES, LLC,
DUNN & DUNN, INC., and
PELLA WINDOWS,

 Defendants,

2

A-2088-17T3

and

BOB MCEWAN
CONSTRUCTION CORP.,

      Defendant-Appellant,

and

JOE MAGGIO CONCRETE &
MASONRY, DENNIS GRANT
CONSTRUCTION CO., A & A
EXTERIORS, INC., GIAMIKE, INC.,

      Defendants-Respondents.

_____

CUMBERLAND MUTUAL
INSURANCE COMPANY, INC.,

      Plaintiff,

v.

ROBERT and JANET MCEWAN,
BOB MCEWAN CONSTRUCTION
CORP., TAMKO BUILDING
PRODUCTS, TRI-STATE
INSPECTION SERVICES, LLC,
DUNN & DUNN, INC.,
JOE MAGGIO CONCRETE &
MASONRY, DENNIS GRANT
CONSTRUCTION CO., A & A
EXTERIORS, INC., GIAMIKE,
INC., and PELLA WINDOWS,

      Defendants.

_____

3

Argued (A-2088-17) and Submitted (A-2149-17)
February 6, 2020 – Decided June 24, 2020

Before Judges Alvarez and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law
Division, Morris County, Docket Nos. L-0394-14 and
L-2255-15.

Francis A. Kirk argued the cause for appellants Adam
Bak and Ava Polansky Bak in Docket No. A-2088-17
(Tesser & Cohen, attorneys; Francis A. Kirk, on the
briefs).

Robert W. Bannon, II, argued the cause for respondent
Bob McEwan Construction Corp. in Docket No. A-
2088-17 (appellant in Docket No. A-2149-17) (Welby,
Brady & Greenblatt, LLP, attorneys; Robert W.
Bannon, II, on the briefs).

Linton W. Turner, Jr., argued the cause for respondents
Robert and Janet McEwan in Docket No. A-2088-17
(Mayfield, Turner, O'Mara & Donnelly, PC, attorneys;
Linton W. Turner, Jr., on the brief).

Edward J. Fanning, Jr., argued the cause for respondent
TAMKO Building Products, Inc. in Docket No. A-
2088-17 (McCarter & English, LLP, attorneys; Edward
J. Fanning, Jr., of counsel and on the brief; Ryan A.
Richman, on the brief).

Elizabeth F. Lorell argued the cause for respondent Tri-
State Inspection Services, LLC in Docket No. A-2088-
17 (Gordon Rees Scully Mansukhani LLP, attorneys;
Elizabeth F. Lorell and JoAnna M. Doherty, of counsel
and on the brief).

4

Michael F. Brandman argued the cause for respondent Joe Maggio, LLC (Weiler & Brandman, attorneys; Michael F. Brandman, on the briefs).

Frank J. Kunzier argued the cause for respondent Dennis Grant d/b/a Dennis Grant Construction Company (Zimmerer, Murray, Conyngham & Kunzier, attorneys; Frank J. Kunzier, of counsel and on the briefs; Sidney E. Goldstein, on the briefs).

Peter A. Gaudioso argued the cause for respondent A&A Exteriors, Inc. (McElroy, Deutsch, Mulvaney & Carpenter, LLP, attorneys; Peter A. Gaudioso, of counsel and on the briefs).

Marc A. Deitch argued the cause for respondent Giamike, Inc. (Kent & McBride, attorneys; Marc A. Deitch, on the brief).

PER CURIAM

Plaintiffs Adam Bak and Ava Polansky Bak filed suit against defendants Robert and Janet McEwan (the McEwans), the general contractor Bob McEwan Construction Corporation (BMCC), the subcontractors involved with the construction of the home at issue, and the home inspectors. On November 30, 2017, the trial judge granted summary judgment to some defendants, and on December 1, 2017, granted the remaining motions and cross-motions for summary judgment. He also dismissed all cross-claims. We now affirm, except that we reverse and remand the order granting defendant Giamike, Inc. (Giamike) summary judgment against BMCC, and the orders dismissing

5

BMCC's cross-claims against A&A Exteriors, Inc. (A&A), Giamike, Dennis Grant d/b/a Dennis P. Grant Construction Company (Grant), and Joe Maggio, LLC (Maggio).

Plaintiffs bought a home from the McEwans for $2.8 million in August 2012. The McEwans had occupied the premises since 2005. During Superstorm Sandy, the roof was damaged and water leaked into the home, although plaintiffs alleged they experienced water leaks prior to the storm. After retaining various consultants and experts, they eventually gutted the house, ultimately demolishing it in May 2015. They have since commenced construction of a new 23,000 square foot home.

I.

Plaintiffs' complaint alleged multiple causes of action, including negligence, breach of warranties, misrepresentation, fraudulent concealment, product liability, and consumer fraud against the various defendants. BMCC filed cross-claims against its subcontractors for indemnification and contribution.

A-2088-17T3

On April 15, 2015, plaintiffs[1] filed the first amended complaint against the following defendants: the McEwans; BMCC; TAMKO Building Products, Inc. (Tamko); Tri-State Inspection Services, LLC (Tri-State); Dunn & Dunn, Inc. (Dunn);[2] Maggio; Grant; A&A; Giamike; and Pella Windows (Pella). The complaint specifically alleged the following counts: breach of contract against the McEwans (count one); breach of implied warranty of habitability against the McEwans and BMCC (count two); breach of implied warranty of workmanlike construction against BMCC (count three); breach of implied warranty of fitness for intended purpose against BMCC and the McEwans (count four); negligence against all defendants (count five); general contractors' negligence against BMCC (count six); home inspector's breach of contract against Tri-State (count seven); breach of the covenant of good faith and fair dealing against the McEwans (count eight); knowing misrepresentation against the McEwans (count nine); negligent misrepresentation against the McEwans (count ten); fraudulent concealment in the sale of real estate against the McEwans (count eleven); product liability in the form of defective design against BMCC and

---

[1] For ease of reference, this opinion will use plaintiffs' first names when referring to them individually.

[2] Plaintiffs represent that Dunn became defunct and did not participate in the action.

A-2088-17T3

Tamko (count twelve); product liability in the form of manufacturing defect against Tamko (count thirteen); product liability in the form of breach of warranty against BMCC and Tamko (count fourteen); and a violation of the Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -224, against all defendants (count fifteen).

## II.

On September 5, 2014, BMCC filed an order to show cause with temporary restraints, seeking to enjoin plaintiffs from altering, modifying, or demolishing the home. On September 15, 2014, the court held a case management conference, during which plaintiffs advised that demolition was scheduled in approximately thirty days but that they would be able to obtain a preliminary expert report identifying the structural and other defects. Once the report was prepared, defendants could inspect the residence with their respective experts. Plaintiffs also represented that, before demolition, they would provide timely notice to defendants, who could be present during demolition. Based upon that agreement, BMCC withdrew the order to show cause.

On September 22, 2014, the trial court memorialized the agreement in an order. It stated plaintiffs would produce a preliminary expert report and afford

defendants a period of ten days after receipt to inspect the property and undertake testing.

Tamko and BMCC filed motions to dismiss for failure to state a claim pursuant to Rule 4:6-2(e). On February 6, 2015, the trial court granted Tamko's motion in part, dismissing the negligence claim (count five) with prejudice. The trial court granted BMCC's motion to dismiss in part, dismissing plaintiffs' claims for breach of implied warranty of habitability (count two), defective design product liability (count twelve), and product liability breach of warranty (count fourteen), with prejudice. The court also dismissed the CFA claim (count fifteen) against Tamko and BMCC without prejudice.

On February 17, 2015, BMCC filed its answer to the complaint. BMCC asserted the following cross-claims against co-defendants Maggio, Grant, A&A, and Giamike: contractual indemnification, contribution, and common law indemnification. Subcontractor defendants filed answers in July 2015 (Giamike), May 2015 (Grant), March 2015 (A&A), and July 2014 (Maggio). By February 2017, both Pella and Giamike had settled with plaintiffs.

After the court rescheduled trial for December 11, 2017, twenty-three motions and cross-motions were filed by the parties. The motions were filed

over a two-month period and were adjourned by the court to November 17, 2017, to be heard simultaneously.

On September 15, 2017, Tamko filed a motion for summary judgment seeking dismissal of plaintiffs' remaining claims for alleged breach of warranty, design defect, and manufacturing defects.

On October 3, 2017, Giamike filed a cross-motion for summary judgment dismissing all cross-claims asserted by BMCC. It requested oral argument if opposition to the motion was submitted.

BMCC filed opposition to Giamike's cross-motion for summary judgment on November 7, 2017, requesting an order denying Giamike summary judgment and also awarding BMCC summary judgment that Giamike was required to defend and indemnify. A&A, Grant, and Maggio each submitted a letter to the court on November 9, 2017, seeking to be heard on Giamike's indemnification motion. Defendants had until October 13, 2017, to file all their motions, a deadline set with consent of all counsel.

On October 10, 2017, the McEwans filed motions for summary judgment as to liability, plaintiffs' lack of proof of damages, and plaintiffs' failure to mitigate damages. On October 31, 2017, BMCC, Maggio, A&A, and Tamko all

filed cross-motions joining the McEwans' motions for summary judgment for plaintiffs' lack of proof of damages and plaintiffs' failure to mitigate damages.

Also on October 10, 2017, BMCC filed a motion for sanctions and dismissal based on plaintiffs' spoliation of evidence due to the demolition of the structure. Tri-State, Maggio, A&A, and Tamko all filed cross-motions joining the spoliation motion. On October 13, 2017, BMCC filed a motion for summary judgment based on the statute of limitations and other defenses. Maggio and A&A both filed cross-motions on October 31, 2017, joining this motion for summary judgment as well.

On October 13, 2017, Tri-State moved for summary judgment on plaintiffs' negligence, breach of contract, and CFA claims. Maggio also filed a motion for summary judgment.

On November 6, 2017, plaintiffs' counsel filed a letter with the trial judge requesting, with the consent of defendants' counsel, an adjournment until December 1, 2017, or December 15, 2017, of the summary judgment motions filed by Maggio, Tri-State, and A&A. Also on that date, plaintiffs' counsel filed a letter with the civil presiding judge requesting, with consent of all counsel, an adjournment of the December 11, 2017, trial date because of the numerous pending summary judgment motions. This request was denied.

On November 9, 2017, BMCC submitted a letter to the court noting that subcontractor defendants sought relief from BMCC's cross-claims in their motions seeking summary judgment relief against plaintiffs. BMCC, as a result, requested that its cross-claims be adjudicated at trial or during post-trial motion practice to allow "for all parties to be heard on the issues related to the" cross-claims.

On November 15, 2017, Giamike's counsel filed a letter confirming that the cross-claim indemnification issues would not be heard during oral argument scheduled for November 17, 2017. The letter also confirmed that the trial court scheduled argument on the indemnification issues for December 1, 2017, and that all briefs must be filed by November 27, 2017.

On November 17, 2017, the trial judge heard oral argument on all opposed motions against plaintiffs. Those motions were: Tamko's motion for summary judgment; the McEwans' motions for summary judgment based on plaintiffs' lack of proof of damages, failure to mitigate, and liability; and BMCC's summary judgment motion pursuant to the statute of limitations and other defenses. The court reserved decision.

On November 22, 2017, plaintiffs filed a motion on short notice to adjourn the trial date and reschedule the motions for summary judgment that were not

12

fully briefed. On November 30, 2017, plaintiffs filed a supplemental certification in further opposition to the McEwans' motion for summary judgment for failure to prove damages.

Also on November 30, 2017, the trial judge issued a statement of reasons granting summary judgment to all defendants, and entered numerous orders on November 30, 2017, and December 1, 2017, reflecting his decision, and also dismissing all cross-claims.

III.

In this appeal, we focus on the summary judgment dismissals anchored in plaintiffs' lack of proof of damages, which are dispositive. We summarize the relevant undisputed facts and circumstances from the summary judgment record.

BMCC purchased the property in 2004 with the intention to build a home for the McEwans. The 7000 square-foot residence was located on a 5.4 acre lot. Construction began that year and the certificate of occupancy issued on August 4, 2005.

BMCC was the general contractor for the construction of the home. Robert was the sole shareholder of BMCC. As the general contractor, BMCC retained the various subcontractors for construction.

A-2088-17T3

Grant was the framing subcontractor for the project and performed the rough framing and installation of windows. A&A installed stucco on the house and detached three-car garage. Maggio installed the foundation walls and footings.

Giamike installed Tamko roof shingles on the home in September 2004, and on the pool shed and detached garage in September 2005. Tamko had a limited warranty for the Lamarite roofing shingles used by Giamike. The limited warranty was written on each shingle tile, and permitted the original owner to transfer the warranty to subsequent purchasers only once and only during the first two years after purchase.

Janet acquired title to the property from BMCC after the completion, and she and Robert lived in the home until its August 21, 2012 sale to plaintiffs. Plaintiffs purchased the residence from her in May 2012, in "as is" condition for $2,850,000.

On May 24, 2012, prior to the closing, Tri-State inspected the home on plaintiffs' behalf. Tri-State was unable to access the roof during the inspection because of overcast and rainy weather, plus the "significant pitch" of the roof. Additionally, some areas in the attic were inaccessible because they were too small. Ava observed portions of the inspection and remembered that Tri-State

inspected the bedrooms, kitchen, and foyer. Tri-State did not observe any water leakage even though it was raining at the time, but did observe stains from previous water leaks in the unfinished attic above the garage.

During Superstorm Sandy in late October 2012, approximately 100 shingles were blown off the roof. On November 5, 2012, Tri-Con Construction, Ltd. (Tri-Con) issued a proposal to plaintiffs to replace 100 shingles and roof caps. Tri-Con fixed the roof damage using Lamarite shingles left by the McEwans. Tri-Con did not observe any other damage to the roof during the repairs.

Plaintiffs filed a homeowner's insurance claim with their carrier, Chubb Insurance Co., on November 6, 2012, claiming that Superstorm Sandy damaged the roofing shingles, a window, and some siding. Chubb closed the insurance claim file in February 2013, because plaintiffs failed to respond to its inquiries.

On November 7, 2012, Ava called Tamko to open a claim under Tamko's limited warranty, and on April 8, 2013, she submitted a written warranty claim. Tamko denied plaintiffs' warranty claim on May 5, 2013, because of the two-year non-transferability clause.

Ava alleged that she "notice[d] potential problems" with the home such as "a rotten window and several leaks," in September 2012, before Superstorm

15

Sandy. While living in the home, the McEwans only observed water leakage through some windows manufactured by Pella in the unfinished attic area of the home and from an opening for a lightning rod through the roof. Tri-Con had caulked sealant around the lightning rod in 2011, waterproofed the chimney next to it, and replaced small pieces of shingle around it.

In an April 2013 letter, plaintiffs' counsel notified the McEwans' attorney of the alleged defects discovered in the home. In a letter dated April 15, 2013, the McEwans' counsel informed plaintiffs "for settlement purposes only" that the McEwans were "agreeable to purchasing back" the residence from plaintiffs. On August 1, 2013, plaintiffs provided a "settlement book," which consisted of a list of cost estimates for the correction of the defects. Settlement discussions continued into at least January 2014.

Plaintiffs rented a townhouse to live in while they started work on the home. Plaintiffs allege they attempted to remediate the defects and removed sheetrock, most of which had been removed by April 21, 2014. They retained additional consultants as exposed areas in the home revealed other conditions after sheetrock had been removed.

In a letter from plaintiffs' counsel dated July 14, 2014, plaintiffs notified defendants that they decided to demolish the entire residence "in light of the cost

A-2088-17T3

and the discovery of pervasive mold," and build a new home on the site. However, in November 2017, Ava certified that they decided to demolish the home based on a combination of factors that included mold but also included "labor intensive" defects, stigma attached to having to disclose the mold, and their architect's "unwillingness" to "stand behind a substantially new structure" if built on the old foundation.

Plaintiffs' July 14, 2014, letter also stated that if defendants wanted to conduct inspections of the property, they needed to do so before July 25. Plaintiffs would give notice when the stucco and stone work would be removed from the façade of the house so that anyone who wished to be present could observe that phase of the demolition.

BMCC's counsel and an expert inspected the home on July 21, 2014. In a letter dated July 25, 2014, BMCC stated that the expert was not able to "adequately and properly assess plaintiffs' claims based on the limited information available from plaintiffs," and that a preliminary report specifically identifying alleged construction defects would enable adequate assessment of the allegations. BMCC, therefore, requested that plaintiffs refrain from demolishing the home until such a report was produced, and its expert had adequate time to review it, otherwise defendants would be prejudiced by

destruction of evidence. Maggio's and Tamko's counsel also sent letters notifying plaintiffs that demolition of the home would result in sanctions. By August 2014, all of the insulation had been removed.

In May 2015, plaintiffs demolished the entire home, including the concrete basement; only the detached three-car garage remained. Plaintiffs' architect, Tomasz Adach, created plans for the new 23,044 square foot residence. The plans were filed on October 6, 2015.

IV.

Plaintiffs' Experts

Plaintiffs retained numerous experts and consultants to generate reports on the alleged construction defects that existed between 2012 and 2015. Frederick Larson, with EnviroVision Consultants, Inc., wrote a report dated February 24, 2014, addressing mold remediation procedures. He wrote another report, dated April 17, 2014, identifying additional areas of mold after the removal of building materials that had previously covered studs, insulation, and sheathing. He recommended plaintiffs continue to follow the mold remediation procedure identified in the initial report. EnviroVision obtained swab surface and bulk material samples on June 13, 2014, at the request of plaintiffs after "substantial demolition" had occurred.

A-2088-17T3

In a June 23, 2014 report, Larson noted additional areas of moisture and fungal growth, and again recommended plaintiffs follow the initial remediation plan and hire a professional mold remediation company to perform the required abatement and cleanup. A final October 24, 2014 report recommended that plaintiffs "look[] into the cost and other benefits of partial or complete demolition of the house to see if that option [was] economically feasible or reasonable when weighing [their] options." Should plaintiffs choose fungal remediation, the use of a professional mold remediation company was recommended.

Anthony Piccione, from Building Evaluations, Inc., created a "Replacement Cost Estimate" dated December 1, 2014, and a revised report dated May 18, 2016. Piccione initially projected reconstruction costs of $3,897,902. His revised report increased the costs to $4,050,535.

SOR Testing Laboratories, Inc. issued findings on laboratory testing of the slate roofing on December 3, 2014. The company concluded that the shingles were prematurely weathered and had completed approximately 66% of the service life in nine years, estimating that only two or three years of service life remained.

A real estate appraiser, Jon Brody, from Appraisal Consultants Corp., on April 27, 2015, assessed the subject property's land value as $703,000. In valuing the property, Brody assumed that the residence had no economic value and that "even though the structures remain[ed] on the site, they [were not] valued." He testified at his deposition that plaintiffs had specifically limited the scope of his report to valuing only the land.

Frederick A. Porcello, on behalf of Porcello Engineering, Inc., on April 12, 2016, identified fifty-six alleged construction defects in writing. During his deposition, Porcello noted that his company did not perform a cost analysis of the home deficiencies.

After oral argument, plaintiffs submitted a certification on November 30, 2017, acknowledging that the Porcello report named "certain defects" that were not previously identified "in all likelihood because not all defects could be discovered or confirmed until demolition had occurred." Plaintiffs attached two more documents: a July 1, 2014, letter from plaintiffs' architect, Adach; and a February 5, 2015 report from Todd Heacock, P.E., of Warren Professional Services, L.L.C.

Adach's letter stated that the "numerous deficiencies to be repaired or replaced and their value equate a new construction; hence the cost of materials

would be the same for new construction as for reconstruction work." He also wrote that "the labor costs for the reconstruction would be substantially higher" and recommended they build a new home.

Heacock's report addressed his observations and opinions about the alleged construction deficiencies. He stated that the effort to replace and remediate the various issues with the alleged defects, such as roofing, mold, and framing, would be labor intensive.

Defendants' Experts

BMCC submitted in support of summary judgment an expert report from Jonathon P. Dixon & Associates, P.C., Professional Engineering. This report addressed numerous documents, including Larson's EnviroVision reports, the SOR report, Porcello's construction defects report, Adach's recommendation letter, and Piccione's building replacement cost estimate. The report disputed the conclusions and recommendations made by plaintiffs' experts.

Gerry Ross, a Tamko employee, also prepared an expert report on Tamko's behalf. Ross's report opined that the roof shingles were improperly installed in numerous locations, that the shingles were not defective, there was no manufacturing defect that caused leaks, that if leaks did occur they did not result

from any design or manufacturing defect in the shingles, and that the shingles' design did not pose a hazard for anyone attempting to walk or stand on the roof.

In June 2016, Mark Sussman of Lasser Sussman Associates, LLC, completed a real estate appraisal of the home as of April 15, 2013, at the request of all defendants. He opined that the market value of the property as of that 2013 date was $2,225,000.

## V.

In a written statement of reasons, the trial court first addressed the statute of limitations issue. It rejected plaintiffs' assertion that the discovery rule applied to toll the time from which the statute began to run, reasoning that the discovery rule did not apply in contract cases. The trial court found that the statute of limitations had expired in 2011, six years after substantial completion of the home. It concluded that the statute of limitations was an "absolute bar to recovery."

The court next briefly addressed the product liability claims, holding that the Products Liability Act (PLA), N.J.S.A. 2A:58C-1 to -11, subsumed those claims. With regard to defendants' spoliation claims, the judge found that plaintiffs demolished their home after defense counsel notified them of the potential spoliation issue. Doing so "absolutely impaired the ability of the

22

defendants to test the alleged 'mold' to counter the plaintiffs' claim that they were forced to demolish their home on this basis," and that it was "crucial evidence" that went to the heart of the case. The court held that plaintiffs' spoliation of the evidence mandated dismissal of the complaint as the sanction.

Most significantly, the trial court found that plaintiffs failed to establish damages, through expert opinion or otherwise. Specifically, plaintiffs presented no evidence as to the cost of repairs, the diminution in value of the home as a result of any alleged defects, or even that the house was unrepairable. Plaintiffs' "testimony alone as to their reason for demolishing the home [was] insufficient as a matter of law." The discovery plaintiffs presented did not support "any proper measure of damages," as there was no expert opinions as to the impaired property value.

The "so-called quotes to perform work [were] mere hearsay." It held that there were "myriad other legal issues presented by the various defendants which [had] been reviewed by the court," but that based upon its analysis of the other issues discussed in the statement of reasons, it was "abundantly clear that summary judgment" was appropriate.

Thus, the court concluded that plaintiffs failed to present genuine issues of material facts. Furthermore, Robert could not be held personally liable to

plaintiffs because he was not an owner of the home. BMCC had no liability to plaintiffs as a general contractor because it was not legally responsible for its subcontractors. Tamko was entitled to summary judgment because plaintiffs failed to present any expert evidence as to the shingles' defects, and failed to file suit within the time required by the warranty. Tri-State had no liability based upon its contract's express provisions.

## VI.

Now on appeal, plaintiffs assert the following errors in the grant of summary judgment:

> POINT I: THE COURT ERRED IN REFUSING TO ADJOURN SUMMARY JUDGMENT MOTIONS AND THE TRIAL ON CONSENT OF ALL PARTIES.
>
> POINT II: THE COURT ERRED IN DECIDING SUMMARY JUDGMENT MOTIONS WHEN THE OPPOSING PARTIES REQUESTED ADJOURNMENTS ON CONSENT AND ADVISED THAT THEY INTENDED TO FILE FACTUAL AND LEGAL OPPOSITION.
>
> POINT III: THE COURT ERRED IN DECIDING SUMMARY JUDGMENT MOTIONS THAT WERE RETURNABLE LESS THAN 30 DAYS PRIOR TO TRIAL, IN CONTRAVENTION OF R. 4:46-1.
>
> POINT IV: THE COURT ERRED IN GRANTING SEVERAL SUMMARY JUDGMENT MOTIONS WITHOUT CITING THE SUPPOSEDLY

24

UNDISPUTED FACTS AND THE APPLICABLE LAW SUPPORTING THOSE DECISIONS.

POINT V: THE COURT ERRED IN GRANTING SUMMARY JUDGMENT MOTIONS WHEN MULTIPLE DISPUTED MATERIAL FACTS EXISTED, AND THE COURT FAILED TO AFFORD THE BENEFIT OF THE DOUBT TO THE PARTY OPPOSING SUMMARY JUDGMENT.

POINT VI: THE COURT ERRED IN FAILING/ REFUSING TO CONSIDER SUPPLEMENTAL SUBMISSIONS IN OPPOSITION TO MOTIONS SEEKING RELIEF REGARDING ALLEGED SPOLIATION OF EVIDENCE.

POINT VII: THE COURT ERRED IN RELYING UPON CERTAIN FACTS THAT WERE CONTRARY TO FACTS CITED BY EITHER THE MOVING PARTY OR OPPOSING PARTY.

POINT VIII: THE COURT MADE PATENTLY INCORRECT RULINGS ON LEGAL ISSUES ON SEVERAL MOTIONS.

POINT IX: SUMMARY JUDGMENT WAS IMPROPERLY ENTERED IN LIGHT OF CONFLICTING EXPERT OPINIONS.

POINT X: IN REVERSING AND REMANDING, THE APPELLATE DIVISION SHOULD RULE OUT THAT SUMMARY JUDGMENT COULD NOT HAVE BEEN GRANTED TO THE DEFENDANTS AND THEREFORE THE CASE SHOULD BE REMANDED FOR TRIAL, NOT FOR FURTHER MOTION ARGUMENT.

POINT XI: IF THE DECISIONS ARE REVERSED, AND THE MOTIONS ARE REMANDED, THEY SHOULD BE ASSIGNED TO A DIFFERENT JUDGE.

POINT XII: IF THE DECISIONS ARE REVERSED, AND THE CASE IS REMANDED, IT SHOULD BE REMANDED TO A DIFFERENT COUNTY.

By way of separate appeal, BMCC raises the following points:

POINT I: THE TRIAL COURT ERRED IN GRANTING DEFENDANT GIAMIKE'S MOTION FOR SUMMARY JUDGMENT AGAINST BMCC.

POINT II: THE SUBCONTRACT INDEMNIFICATION CLAUSE IS ENFORCEABLE AND REQUIRED SUBCONTRACTOR DEFENDANTS TO INDEMNIFY BMCC FOR EVEN BMCC'S OWN NEGLIGENCE, WHICH AS A MATTER OF LAW WAS NONE.

POINT III: THE TRIAL COURT ERRED IN CANCELLING ORAL ARGUMENT AND SUA SPONTE DISMISSING BMCC'S CROSS-CLAIMS AGAINST THE SUBCONTRACTOR DEFENDANTS.

Because plaintiffs failed to produce proof of damages, we only address the claim of error regarding that issue. The patchwork of expert reports and opinions plaintiffs obtained simply did not fill the void. The remaining issues plaintiffs raise are made moot by the disposition.

26

## VII.

"An appellate court reviews an order granting summary judgment in accordance with the same standard as the motion judge." Bhagat v. Bhagat, 217 N.J. 22, 38 (2014). That standard requires the court to "review the competent evidential materials submitted by the parties to identify whether there are genuine issues of material fact and, if not, whether the moving party is entitled to summary judgment as a matter of law." Ibid. (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)); R. 4:46-2(c). If "a legal issue is involved in the absence of a genuine factual dispute, that standard is de novo, and the trial court rulings 'are not entitled to any special deference.'" Henry v. N.J. Dep't of Human Servs., 204 N.J. 320, 330 (2010) (quoting Manalapan Realty, LP v. Manalapan Twp. Comm., 140 N.J. 366, 378 (1995)).

"An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." R. 4:46–2(c). The "'genuine issue [of] material fact' standard mandates that the opposing party do more than 'point[] to any fact in dispute' in order to defeat summary judgment." Globe

Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016) (alterations in original) (quoting Brill, 142 N.J. at 529).

N.J.R.E. 101(b)(2) defines the "burden of producing evidence" as "the obligation of a party to introduce evidence when necessary to avoid the risk of a judgment or peremptory finding against that party on an issue of fact." That burden "has been described as so light as to be 'little more than a formality.'" State v. Segars, 172 N.J. 481, 494 (2002) (quotations omitted) (quoting Mogull v. CB Commercial Real Estate Co., Inc., 162 N.J. 449, 469 (2000)). Moreover, that burden "is met whether or not the evidence produced is found to be persuasive." Ibid.

Compensatory damages are designed "to put the injured party in as good a position as he would have been if performance were rendered as promised." St. Louis, L.L.C. v. Final Touch Glass & Mirror, Inc., 386 N.J. Super. 177, 188 (App. Div. 2006) (quoting 525 Main St. Corp. v. Eagle Roofing Co., 34 N.J. 252, 254 (1961)). Generally, the appropriate award of damages is the diminution in the value of the property or the reasonable cost of restoring or repairing the damage. Velop, Inc. v. Kaplan, 301 N.J. Super. 32, 64 (App. Div. 1997).

"Damages for defective construction, whether those damages are the result of a breach of contract or negligence of the contractor, are often determined by

using the reasonable cost of remedying the defects unless that cost is clearly disproportionate to the property's probable loss of value." St. Louis, L.L.C., 386 N.J. Super. at 188. When "the cost of repairs vastly exceeds . . . the probable market value of the property," then it may be unfair to use the restoration-cost method of quantifying property damage. Mosteller v. Naiman, 416 N.J. Super. 632, 638 (App. Div. 2010) (alteration in original) (quoting Correa v. Maggiore, 196 N.J. Super. 273, 285 (App. Div. 1984)).

Moreover, if the cost-of-repairs approach would result in "unreasonable economic waste," then that method should not be employed. Ibid. (quoting Correa, 196 N.J. Super. at 285). "However, reasonable repair costs that exceed the diminution of the property's value are appropriate 'in some circumstances[, such as] where the property owner wishes to use the property rather than sell it.'" Ibid. (alterations in original) (quoting Velop, Inc., 301 N.J. Super. at 64); cf. St. Louis, L.L.C., 386 N.J. Super. at 191-92 (explaining the damages in that case would not cause economic waste because the damage award was "not in excess of the value of the property, nor would it permit a substantial upgrade of the house").

To evaluate which method of quantifying damages is appropriate, parties must present expert opinions providing the value of the impaired property and

cost of repairs or restoration. See St. Louis, L.L.C., 386 N.J. Super. at 193-94 (relying on expert opinion when determining that the trial court did not err in ruling that the cost of repair was the proper element of consideration for determining damages); Velop, Inc., 301 N.J. Super. at 64-66 (holding that the proper measure of damages was the difference between the contract price and the market value of the property because the expert opinion presented a restoration cost that would have resulted in approximately two million dollars more than the value of the property).

## VIII.

Here, the trial court granted defendants' motions for summary judgment because plaintiffs did not present proof of damages despite producing many expert opinions. Their discovery "did not support any proper measure of damages." Plaintiffs did not present expert testimony as to the value of the impaired property. This glaring void in plaintiffs' proofs means there is no genuine issue of material fact which is in dispute, and that defendants are entitled to judgment as a matter of law. See Brill, 142 N.J. at 540.

Plaintiffs on appeal argue that their experts did present evidence as to the costs of repairs and appraised value of the home, and that the parties' conflicting expert reports should have prevented summary judgment. In support of the

argument that summary judgment is not appropriate where there are conflicting expert opinions, plaintiffs rely on Davin, LLC v. Daham, 329 N.J. Super. 54 (App. Div. 2000). But Davin was a legal malpractice case in which the trial judge granted summary judgment by relying on his prior experience as a practicing attorney in knowing that a tenant's lawyer never orders a title search before advising a client to enter into a lease. Id. at 71. We determined that the conflicting certifications created a genuine issue of material fact as to whether ordering a title search for a commercial tenancy was necessary competent representation. Ibid. That fact was certainly material to the dispute between the parties. The disputes here are not material.

Plaintiffs name Porcello, Brody, Piccione, Larson, Ali Gurhan of SOR Testing Laboratories, and Greg Gerdes of Pella Construction as "nominated experts for whom the defendants did not produce opposing experts[.]"

None of the experts' reports plaintiffs submitted, however, would enable a trier of fact to properly assess construction defect damages. And that is the issue—whether those reports would aid a jury in assessing damages. Certainly, the experts identified defects, the value of the land, the existence of mold, and issues with the roofing shingles, however, none opine as to the financial

consequences of plaintiffs' allegations regarding the harm inflicted by defendants.[3]

Porcello, for example, when asked regarding the cost of remediation of foundation walls at deposition, testified that his firm "[did not] do a cost analysis on anything." His report did not conclude that the defects required complete demolition and reconstruction of the residence.

Contrary to plaintiffs' contention, Brody did not appraise the value of the property and "determine[] that the home itself had zero value, and the only positive value to the Property was for the land itself." Brody's letter began with the most significant assumption made in the valuation—that "based on extensive engineering reports, . . . the single family home and all additional improvements on the property, due to various forms of damage over time, have no economic value or economic contributory value to the overall property." At deposition, Brody testified that plaintiffs defined the limits of his report, and instructed his firm not to value the improvements made on the land.

Piccione's report provided only the estimated cost of reconstructing the home. The report did not address any estimate to repair the home prior to

---

[3] No reports by Gerdes are included in the appellate record provided to us.

demolition or whether the cost to demolish and rebuild would have been less than to repair.

Larson's report related to how the remediation process should occur, including ways to prevent the spread of contamination and the required use of protective equipment. No conclusions or opinions as to the level of contamination in the residence, the need to demolish the home, or a cost for the remediation process were provided. Larson's report detailed the steps necessary to remediate the home without demolition. His subsequent reports also only identified additional fungal issues, and although his last one recommended exploration of the notion of demolition versus remediation expenses, the report did not do so and no numbers were included. Indeed, Larson testified that he "never told [Ava] that she should" demolish the entire house and learned plaintiffs had done so the day before deposition. He never discussed with Ava the cost of performing the remediation.

Gurhan's report did not state that the cost of replacing the roof shingles merited demolition of the residence. Rather, the report concluded that some of the shingles were improperly installed and prematurely weathered, and estimated the remainder of the shingles' life would be only another two or three

33

years. Some of the roofing experienced "early failure" but that does not equate to values that would enable a jury to determine damages.

In their reply brief, plaintiffs contend that Adach's letter warranted denial of summary judgment because it indicated demolition was necessary. Even though Adach was not designated as an expert, his letter should be considered because it was "based on his personal observations at the jobsite." Since it sets forth reasons for his recommendation, it is admissible as a lay opinion. This argument, however, is raised in a footnote, and thus we do not address it. See Almog v. Israel Travel Advisory Serv., Inc., 298 N.J. Super. 145, 155 (App. Div. 1997) (stating that courts will not "countenance the raising of additional legal issues" in footnotes and "need not respond to oblique hint and assertions made" within them). The letter makes no mention of damages, or of any calculations contrasting the cost to repair, demolish, or rebuild.

As consequential damages are the remedy for plaintiffs' claims against defendants, and a required element to establish some of the causes of action, the order granting summary judgment based on plaintiffs' lack of proper proof of damages is legally correct and dispositive. See, e.g., Globe Motor Co. v. Igdalev, 225 N.J. 469, 482 (2016) (identifying damages as an element for a breach of contract claim); D'Agostino v. Maldonado, 216 N.J. 168, 184-85

(2013) (stating that a claim under the CFA requires damages); <u>Carroll v. Cellco</u>

<u>P'ship</u>, 313 N.J. Super. 488, 502 (App. Div. 1998) (naming damages as an

element in a claim for negligent misrepresentation).[4]

Plaintiffs further allege that they presented evidence that they suffered

damages in the form of alternate living expenses and costs to investigate the

alleged defects, which did not require expert testimony, and which the court did

not consider. However, the document plaintiffs cite in support of this assertion

is a chart they generated that identified alleged costs they incurred, without any

receipts, invoices, or other supportive evidence.

Many of the "disputed" facts plaintiffs rely on are just the expert opinions.

However, even accepting plaintiffs' expert opinions as true for summary

judgment purposes, they do not establish the facts necessary to support their

claim. Although an expert provided an estimate of the cost of rebuilding the

home, they could not give any estimate of what the costs would have been to

remediate, or even whether demolition was necessary in the first place.

---

[4] Plaintiffs also argue the trial court erred in finding no basis for liability against BMCC, the McEwans, Tamko, Tri-State, and Maggio in their reply brief. This too is improper, however. <u>See</u> <u>In re Bell Atl.-N.J., Inc.</u>, 342 N.J. Super. 439, 442 (App. Div. 2001) ("It is improper to introduce new issues in a reply brief."); <u>Liebling v. Garden State Indem.</u>, 337 N.J. Super. 447, 465-66 (App. Div. 2001) ("[A]n issue not briefed . . . is deemed waived.").

A-2088-17T3

Similarly, plaintiffs' real estate expert valued the land only and "assumed" the house was of no value, but did not come to his own conclusion. See Igdalev, 225 N.J. at 479 (stating that the party must do more than point to any fact in dispute). Having reviewed the voluminous materials submitted, and drawing all inferences in favor of the non-moving parties, we reach the inescapable conclusion that defendants are entitled to judgment as a matter of law. See R. 4:46-2(c).

## IX.

Having found that plaintiffs' claims were properly dismissed, we now reach the issue of BMCC's cross-claims for counsel fees and court costs. BMCC entered into subcontractor agreements with Giamike, A&A, Grant, and Maggio for the construction of the residence. These agreements each included enumerated paragraphs addressing indemnification:

> 1. Subcontractor agrees to defend, indemnify, and hold Contractor [BMCC] harmless and, if requested by Contractor [BMCC], the Owner, their consultants, agents and employees of any of them, from and against any and all claims, suits, losses or liability, including attorneys' fees and litigation expenses, for or on account of injury to or death of persons, including subcontractor's employees, or damage to or destruction of property, or any bond obtained for the same, arising out of or resulting from any act or omission, or alleged act or omission, of Subcontractor, its employees or

36

agents, whether caused in part or by a party indemnified hereunder.

BMCC contends that plaintiffs' lawsuit required Giamike to reimburse it as called for by the agreement between general and subcontractor, and that it was not necessary for BMCC to prove Giamike caused the alleged damage. BMCC contends the trial judge erred by granting Giamike's motion for summary judgment and dismissing its cross-claims against the other subcontractor defendants without either explaining its analysis and without oral argument on the issue.

Maggio and Grant argue that we should exercise original jurisdiction and render a decision, while A&A argues the trial court's lack of support is harmless error because we review issues of law de novo.

We rarely exercise original jurisdiction. As our Supreme Court has said, our

> [r]esort to original jurisdiction is particularly appropriate to avoid unnecessary further litigation, as where the record is adequate to terminate the dispute and no further fact-finding or administrative expertise or discretion is involved, and thus a remand would be pointless because the issue to be decided is one of law and implicates the public interest.
>
> [Price v. Himeji, L.L.C., 214 N.J. 263, 294 (2013) (alteration in original) (quoting Vas v. Roberts, 418 N.J. Super. 509, 523-24 (App. Div. 2011)).]

A-2088-17T3

The interpretation and construction of a contract is a matter of law and thus we review the trial court's decision de novo. Kaur v. Assured Lending Corp., 405 N.J. Super. 468, 474 (App. Div. 2009); Manalapan Realty, 140 N.J. at 378.

Trial courts are required to "find the facts and state its conclusions in accordance with R. 1:7-4." R. 4:46-2(c). As such, a "trial judge is obliged to set forth factual findings and correlate them to legal conclusions," and "[t]hose findings and conclusions must then be measured against the standards set forth in [Brill, 142 N.J. at 540]." Great Atl. & Pac. Tea Co., Inc. v. Checchio, 335 N.J. Super. 495, 498 (App. Div. 2000). "Cross-motions for summary judgment do not preclude the existence of fact issues." Ibid.

Moreover, Rule 1:6-2(d) requires that a request for oral argument "shall be granted as of right." If a trial court "decides the motion on the papers despite a request for oral argument, the trial court should set forth in its opinion its reasons for disposing of the motion for summary judgment on the papers in its opinion." LVNC Funding, L.L.C. v. Colvell, 421 N.J. Super. 1, 5 (App. Div. 2011). We have reversed summary judgment where a trial court did not address the movant's request for oral argument and did not provide on the record a basis

for its relaxation of Rule 1:6-2. Great Atl. & Pac. Tea Co., 335 N.J. Super. at 497-98.

Here, the trial court did not state on the record nor did the orders for dismissal set forth factual findings or draw legal conclusions about BMCC's cross-claims, making this matter appropriate for a remand. Further aggravating this error was the trial court's failure to hold oral argument on Giamike's motion for summary judgment on the indemnification issues raised by BMCC's cross-claims. It had scheduled argument, but then cancelled it after the parties argued the motions against plaintiffs. But the issue was not addressed during that November 17, 2017 argument.

The only reference in the statement of reasons to that cross-claim is a sentence that "Giamike filed a motion for summary judgment reciting much of the same argument as Tamko but stating that there is no proof that the roof was defectively installed and that BMCC indemnified it as a subcontractor." The trial court also concluded that BMCC had "no liability to plaintiffs as a general contractor is not legally responsible for its subcontractors." The court ended its statement of reasons by noting there were "myriad other legal issues presented by the various defendants which have been carefully reviewed by the court,

however, based upon the above analysis it is abundantly clear that summary judgment is appropriate."

The interpretation of this provision is not purely legal, as the liability of the subcontractor defendants and BMCC, and the impact of BMCC's liability, if any, are contested. The subcontractor defendants argue the contracts cannot in reason require them to indemnify BMCC for its own negligence, while BMCC contends the contracts do provide for that contingency, but that it was not negligent.

Giamike also argues that the New Jersey Property-Liability Insurance Guaranty Association Act (NJPLIGA), N.J.S.A. 17:30A-1 to -20, precludes BMCC from seeking indemnification, because of Giamike's insurance carrier's liquidation. Again, the trial court made no findings or conclusions, or even addressed this argument in any form, in its statement of reasons or on the record.

Contrary to the rule, the court neither made factual findings, drew legal conclusions, or even allowed oral argument. Thus, the orders dismissing BMCC's cross-claims must be remanded.

The orders granting summary judgment against plaintiffs are affirmed; the order granting Giamike summary judgment against BMCC is reversed; and the

orders dismissing BMCC's cross-claims against A&A, Giamike, Grant, and Maggio, are remanded for further proceedings on BMCC's cross-claims.

Affirmed in part; reversed and remanded in part.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2088-17T3